IN THE SUPREME COURT OF NORTH CAROLINA

No. 241A22

Filed 6 April 2023

IN THE MATTER OF: G.C.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 284 N.C. App. 313 (2022), vacating an order entered on 19 October 2021 by Judge Cheri Siler Mack in District Court, Cumberland County, and remanding for additional adjudicatory findings. Heard in the Supreme Court on 31 January 2023.

> *Patrick A. Kuchyt for petitioner-appellant Cumberland County Department of Social Services.*
>
> *McGuireWoods LLP, by Anita M. Foss, for appellant Guardian ad Litem.*
>
> *Sean P. Vitrano for respondent-appellee father.*

BARRINGER, Justice.

In this matter, we consider whether the Court of Appeals erred by determining that the trial court's findings of fact did not support its conclusion adjudicating Glenda[1] a neglected juvenile. Appellate courts review de novo whether the findings of fact support a conclusion of law adjudicating a minor a neglected juvenile. *In re K.S.*, 380 N.C. 60, 64 (2022). Having reviewed the trial court's findings of fact and

---

[1] Pseudonyms are used in this opinion to protect the juveniles' identities and for ease of reading.

this Court's precedent, we conclude that the Court of Appeals erred and accordingly reverse the Court of Appeals' decision.

## I.   The Trial Court's Adjudication and Disposition Order

After an adjudication hearing in August 2021, the trial court found as follows: Glenda's mother has two older children who have been in the custody of Cumberland County Department of Social Services (DSS) since 2017. In May 2018, the older children were adjudicated abused, neglected, and dependent juveniles based on one child's bruises and severe malnourishment. Glenda's mother and that child's father had failed to feed the child. Given the circumstances that existed at the time of the adjudication hearing in those cases, the trial court in that matter relieved DSS of reunification efforts pursuant to N.C.G.S. § 7B-901(c)(1)(b) and (f). As to her two older children, Glenda's mother was also convicted of misdemeanor child abuse and placed on probation. The older children's father was convicted of felony child abuse.

In September 2018, Glenda's mother gave birth to Glenda. Glenda's birth certificate lists respondent as her father.[2] DSS provided case management services to Glenda's mother and respondent from December 2018 to August 2019. During that time, Glenda's mother and respondent abided by all safety plans, and Glenda's mother completed services as ordered by the trial court in the older children's cases.

In December 2019, Glenda's mother gave birth to another child, Gary, to whom respondent is the father. Glenda's mother, respondent, Gary, and Glenda lived

---

[2] Respondent is not the father of the two older children.

together in the same residence. Respondent provided care and supervision for both children.

On 12 March 2020, a few months after Gary's birth, Glenda's mother placed Gary in his Pack 'n Play and propped a bottle for him to feed. Around 4:15 p.m. Glenda's mother burped Gary, laid a folded large, fuzzy, thick blanket in the bottom of his Pack 'n Play, and placed Gary on his side on the blanket in his Pack 'n Play. Two other smaller blankets were also in the Pack 'n Play. Over three hours later, around 7:38 p.m., Glenda's mother checked on Gary and found him unresponsive. Glenda's mother picked up Gary and ran to the paternal grandmother's house for help. The paternal grandmother is a nurse, and she told Glenda's mother to call 911. Glenda's mother then called 911. After arriving at respondent and Glenda's mother's home, Emergency Medical Services pronounced Gary dead. Emergency Medical Services observed Gary "foaming from the nose and the mouth, indicative of asphyxiation." The police officers who arrived on the scene also noticed two used baby bottles and several blankets in the Pack 'n Play. Respondent was at work when these events occurred.

The medical examiner's autopsy report stated that "*sleeping in an environment with blankets while less than one year of age is a risk factor for an accidental asphyxial event. An asphyxial event cannot be ruled out based on the autopsy findings.*" Both respondent and Glenda's mother had been instructed about proper sleeping arrangements for children.

After Gary's death, respondent and Glenda's mother agreed to allow Glenda to be temporarily placed with Glenda's paternal grandmother. Thereafter, DSS filed a petition alleging that Glenda was a neglected juvenile. Glenda was approximately one and a half years old. The trial court found that Glenda "lived in an environment injurious to [her] welfare; and that [she] does not receive proper care, supervision, or discipline from [her] parent, guardian, [or] custodian."

Based on the foregoing findings of fact, the trial court concluded as a matter of law that Glenda is a neglected juvenile within the meaning of N.C.G.S. § 7B-101(15).

Respondent appealed. Glenda's mother also appealed the adjudication and disposition order but later moved to dismiss her appeal. The Court of Appeals allowed Glenda's mother's motion to dismiss her appeal.

## II.    The Court of Appeals' Decision

The Court of Appeals majority vacated the trial court's adjudication and disposition order and remanded on the ground that "the trial court made no finding or determination Glenda suffered any physical, mental, or emotional impairment or that Glenda was at a substantial risk of such impairment as a consequence of any failure to provide proper care, supervision, or discipline to support the adjudication of Glenda as a neglected juvenile." *In re G.C.*, 284 N.C. App. 313, 319 (2022) (citing *In re J.A.M.*, 372 N.C. 1, 9 (2019)). According to the majority, unlike this Court's decision in *In re J.A.M.*, the trial court "failed to find 'the presence of other factors' indicating a present risk *to Glenda* when it reached its conclusion that *Glenda* was

neglected as a matter of law." *Id.* (quoting *In re J.A.M.*, 372 N.C. at 10).

The dissent disagreed with the majority's holding and reasoning. *Id.* at 320–21 (Griffin, J., dissenting). The dissent acknowledged that this Court's precedent in *In re J.A.M.* precluded an adjudication of neglect solely based on previous department of social services involvement with other children. *Id.* at 320. According to the dissent, "other factors" suggesting that neglect will be repeated are needed. *Id.* at 320 (quoting *In re J.A.M.*, 372 N.C. at 9). However, unlike the majority, the dissent concluded that there were other factors present because the trial court also relied on and made "specific findings relating to the circumstances of Gary's death, a child who DSS had no previous involvement with, under [m]other's supervision, in the home that Glenda also resided in." *Id.* at 320. According to the dissent, "the evidence is clear that Glenda is at a substantial risk of harm in [respondent and Glenda's mother's] home based upon the trial court's findings about [m]other's older children, showing a history of neglecting children, and the findings detailing the circumstances around Gary's death, evidencing current issues with supervision and care in [respondent and Glenda's mother's] home." *Id.* at 321.

## III. Standard of Review

"An appellate court reviews a trial court's adjudication to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re K.S.*, 380 N.C. at 64 (cleaned up). "A trial court's finding of an ultimate fact is conclusive on appeal if the evidentiary facts reasonably

support the trial court's ultimate finding [of fact]."[3] *State v. Fuller*, 376 N.C. 862, 864 (2021). "Where no [objection is made] to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal." *In re K.S.*, 380 N.C. at 64 (quoting *Koufman v. Koufman*, 330 N.C. 93, 97 (1991)).

Appellate courts review a trial court's conclusion of law concerning

---

[3] In prior cases, this Court has misused the term "ultimate fact," saying that an "ultimate finding is a conclusion of law or at least a determination of a mixed question of law and fact," *In re N.D.A.*, 373 N.C. 71, 76 (2019) (quoting *Helvering v. Tex-Penn Oil Co.*, 300 U.S. 481, 491 (1937)), which is contrary to decades of this Court's well-established precedent. Writing for a unanimous Court in 1951, Justice S. J. Ervin Jr. explained:

> There are two kinds of facts: Ultimate facts, and evidentiary facts. Ultimate facts are the final facts required to establish the plaintiff's cause of action or the defendant's defense; and evidentiary facts are those subsidiary facts required to prove the ultimate facts. . . .
>
> . . . .
>
> . . . Ultimate facts are those found in that vaguely defined area lying between evidential facts on the one side and conclusions of law on the other. In consequence, the line of demarcation between ultimate facts and legal conclusions is not easily drawn. An ultimate fact is the final resulting effect which is reached by processes of logical reasoning from the evidentiary facts. Whether a statement is an ultimate fact or a conclusion of law depends upon whether it is reached by natural reasoning or by an application of fixed rules of law.
>
> When the statements of the judge are measured by this test, it is manifest that they constitute findings of ultimate facts, *i.e.*, the final facts on which the rights of the parties are to be legally determined.

*Woodard v. Mordecai*, 234 N.C. 463, 470, 472 (1951) (citations omitted). To avoid confusion in the future, we overturn our prior caselaw to the extent it misuses the term "ultimate fact" and clarify that, as Justice Ervin wrote in *Woodard* and consistent with well-established precedent, an ultimate finding is a finding supported by other evidentiary facts reached by natural reasoning.

adjudication de novo. *Id.* In this context, de novo review requires the appellate court to "determin[e] whether or not, from its review, the findings of fact supported a conclusion of neglect." *Id.* at 65. In other words, the appellate court "freely substitutes" its conclusion for the trial court's conclusion concerning whether the findings of fact support or do not support that Glenda is a neglected juvenile. *See In re T.M.L.*, 377 N.C. 369, 375 (2021).

## IV.    Analysis

We begin our analysis with the definition of "neglected juvenile" as set forth by the legislature in N.C.G.S. § 7B-101(15). The relevant provisions for this matter are as follows:

> (15)    Neglected juvenile.—Any juvenile less than 18 years of age . . . whose parent, guardian, custodian, or caretaker does any of the following:
>
> a.  Does not provide proper care, supervision, or discipline.
>
> . . . .
>
> e.  Creates or allows to be created a living environment that is injurious to the juvenile's welfare.
>
> . . . .
>
> In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect or lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.

N.C.G.S. § 7B-101(15) (2021).

Here, the trial court specifically found that Glenda "lived in an environment

injurious to [her] welfare; and that [she] does not receive proper care, supervision, or discipline from [her] parent, guardian, [or] custodian." These findings are properly characterized as ultimate findings and satisfy the statutory definition of neglected juvenile.

The ultimate findings of fact that Glenda does not receive proper care, supervision, or discipline from her parents is supported by the trial court's evidentiary findings of fact and reached by natural reasoning from the evidentiary findings of fact. Specifically, Glenda lived in the same residence as Glenda's mother, respondent, and Gary. Respondent provided care and supervision for Glenda as he had for her brother Gary until his death. Glenda's mother had previously been convicted of misdemeanor child abuse, and her older children had previously been adjudicated abused, neglected, and dependent juveniles for reasons that included Glenda's mother's failure to feed one of the older children.

On 12 March 2020, respondent was at work, and only Glenda's mother was with Gary. That day, Glenda's mother left Gary, who was three months old, in his Pack 'n Play on his side with blankets for over three hours without supervision even though "*sleeping in an environment with blankets while less than one year of age is a risk factor for an accidental asphyxial event.*" When Glenda's mother did finally check on Gary around 7:38 p.m., she found Gary unresponsive. She responded by running to the home of a relative, who was a nurse and lived nearby. Glenda's mother called 911 after the relative instructed her to do so. Gary was pronounced dead by

Emergency Medical Services upon arrival at the residence. Emergency Medical Services observed Gary "foaming from the nose and the mouth, indicative of asphyxiation," and the medical examiner could not rule out an asphyxial event given the autopsy findings. Both respondent and Glenda's mother had been instructed about proper sleeping arrangements for children.

Although there is no mention of Glenda, who was approximately one and a half years old at the time, or her whereabouts on 12 March 2020 in the trial court's findings of fact, the foregoing evidentiary findings support the ultimate finding that Glenda does not receive proper care, supervision, or discipline from her parents and the conclusion of law that Glenda is a neglected juvenile. Subsection (15) of N.C.G.S. § 7B-101 provides that:

> In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect or lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.

N.C.G.S. § 7B-101(15). Here, both relevant situations are present. First, Glenda lived in the home where Gary died as a result of suspected neglect, asphyxia on account of blankets in his Pack 'n Play and a lack of supervision and care. Second, Glenda lived in the home where Gary was neglected. He was placed in an injurious environment, a Pack 'n Play with blankets, in the home he shared with Glenda's mother, respondent, and Glenda. Further, the aforementioned neglect was not based on ignorance since Glenda's mother and respondent had been instructed on proper

sleeping arrangements for children.

These facts reflect "current circumstances that present a risk" to Glenda, *In re J.A.M.*, 372 N.C. at 9, not "[a] prior and closed case with other children and a different father," *In re J.A.M.*, 259 N.C. App. 810, 822 (2018) (Tyson, J., dissenting); *see In re J.A.M.*, 372 N.C. at 9 (agreeing with dissenting opinion at the Court of Appeals). Thus, similarly to this Court's decision in *In re J.A.M.*, the adjudication of neglect in this matter is not based solely on the prior adjudication that Glenda's mother's older children were abused, neglected, and dependent juveniles. *See In re J.A.M.*, 372 N.C. at 10 ("Here, the prior orders entered into the record were not the sole basis for the trial court's decision. Rather, the trial court also properly found 'the presence of other factors' indicating a present risk to J.A.M. when it reached its conclusion that J.A.M. was neglected as a matter of law.").

This Court did not hold in *In re J.A.M.* that trial courts must make a written "finding or determination" that each juvenile "suffered . . . physical, mental, or emotional impairment" or "was at a substantial risk of such impairment as a consequence of any failure to provide proper care, supervision, or discipline" to support the adjudication of a juvenile as a neglected juvenile, *In re G.C.*, 284 N.C. App. at 319; *see In re J.A.M.*, 372 N.C. at 9. Rather, this Court previously adopted this assessment from the Court of Appeals in *In re Stumbo* to clarify that the legislature did not intend that every act of negligence on the part of parents satisfies the definition of a neglected juvenile as set forth in N.C.G.S. § 7B-101(15). *In re*

*Stumbo*, 357 N.C. 279, 283 (2003); *cf. Troxel v. Granville*, 530 U.S. 57, 68–69 (2000) (O'Connor, J., plurality opinion) ("[S]o long as a parent adequately cares for his or her children (*i. e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children."). This assessment remains useful and remains the law—there must "be some physical, mental, or emotional impairment of the juvenile *or a substantial risk of such impairment* as a consequence of the failure to provide 'proper care, supervision, or discipline.' " *In re J.A.M.*, 372 N.C. at 9 (quoting *In re Stumbo*, 357 N.C. at 283).

However, to be clear, there is no requirement of a specific written finding of a substantial risk of impairment. As raised by DSS, a substantial risk of impairment is not contained in the statutory definition of neglect. *See* N.C.G.S. § 7B-101(15).[4] Rather, the trial court must make written findings of fact sufficient to support its conclusion of law of neglect. And in this matter, the trial court's written findings of fact support its conclusion that Glenda is a neglected juvenile.[5]

Given the foregoing, we conclude that the Court of Appeals erred by misconstruing and misapplying this Court's precedent in *In re J.A.M.* as raised by

---

[4] While "substantial risk of serious physical injury" is found in the definition of "[a]bused juveniles," the legislature did not use similar language in the definition of "[n]eglected juvenile," further indicating that the legislature did not intend to require a finding of fact of substantial risk of impairment. *See* N.C.G.S. § 7B-101(1), (15) (2021).

[5] To the extent any Court of Appeals' decision requires a written finding of fact by the trial court of substantial risk of impairment, such decisions are overruled.

the dissent in the Court of Appeals and argued by the guardian ad litem and DSS and by vacating the trial court's order and remanding this matter when the findings of fact support the conclusion that Glenda is a neglected juvenile.

## V.   Conclusion

The Court of Appeals erred by requiring findings of fact from the trial court to adjudicate a juvenile neglected that are not required by statute or this Court's precedent. The Court of Appeals also appears to have discounted the statutes and our precedent that recognize that neglect of another juvenile can be relevant as to whether a juvenile is a neglected juvenile. *See* N.C.G.S. § 7B-101(15); *see, e.g., In re J.A.M.*, 372 N.C. at 10–11. In this matter, as in *In re J.A.M.*, the trial court's findings of fact addressed "present risk factors in addition to an evaluation of past adjudications involving other children," *In re J.A.M.*, 372 N.C. at 11, and the findings of fact supported the trial court's adjudication and conclusion of law that Glenda was a neglected juvenile. Accordingly, we reverse the Court of Appeals' decision.

REVERSED.

Justice EARLS dissenting.

This case involves the adjudication of Glenda[1] as neglected, based on what may have been the accidental death of her infant brother, Gary. The medical examiner who examined Gary's body was uncertain of Gary's cause of death. He noted that while he could not rule out "an accidental asphyxial event," his clinical findings showed that Gary's death "could be consistent with a diagnosis of sudden infant death syndrome" (SIDS). Ultimately, the medical examiner classified Gary's death as "undetermined." Despite these facts, the majority makes no mention of SIDS or the undetermined nature of Gary's death, concluding that Gary died from asphyxiation.

The law governing termination of parental rights has one central purpose: to keep children safe. *See* N.C.G.S. § 7B-1100 (2022). But in many cases in which a child dies from SIDS, the parents have not harmed the child. *See* Kent P. Hymel, MD, & the Committee on Child Abuse & Neglect, *Distinguishing Sudden Infant Death Syndrome From Child Abuse Fatalities*, 118 Pediatrics, 421, 422 (July 2006) (hereinafter *Distinguishing SIDS from Child Abuse*) (discussing the link between SIDS and brain stem abnormalities). Rather, these parents have acted like any good parent: loving and caring for their child, and making sure their child has enough food to eat and a roof over his or her head.

---

[1] Glenda and Gary are pseudonyms used to protect the children's identities.

American jurisprudence recognizes that parental "natural bonds of affection lead [them] to act in the best interests of their children." *Troxel v. Granville*, 530 U.S. 57, 68 (2000) (O' Connor, J., plurality opinion) (quoting *Parham v. J.R.*, 443 U.S. 584, 602 (1979). Consequently, "there is a presumption that a fit parent will act in the best interests of their children." *Id.* (citing *J.R.*, 442 U.S. at 602). Yet today the majority contravenes that presumption, potentially creating the possibility that whenever a parent loses a child to SIDS, the parent is also at risk for losing the other children in the home. This is contrary to our law and manifestly unjust. Accordingly, I dissent.

Glenda was born on 23 September 2018. When Glenda was approximately one and a half years old, DSS filed a petition on 13 March 2020 to adjudicate her as neglected. On 19 October 2021, the trial court adjudicated her as such under N.C.G.S. § 7B-101(15) because she "did not receive proper care, supervision, or discipline from [her] parent[s], guardian, custodian, or caretaker, and [she] lived in an environment injurious to [her] welfare."

Gary and Glenda's mother has two older children who were previously placed in DSS custody on 28 December 2017 following their adjudication as abused, neglected, and dependent.[2] After Glenda was born, mother and respondent-father received DSS case management support from December 2018 through August 2019. During the nine months DSS was involved in Glenda's life, the parents properly cared for Glenda and abided by all safety plans.

---

[2] Respondent father is not the father of those children.

Gary was born on 16 December 2019. On 12 March 2020, respondent-father was at work, and mother was home caring for Gary. Although the cause of Gary's death remains unclear, the trial court found that mother fed Gary, burped him, and placed him on his side in a "Pack n Play" with several blankets. Approximately three hours later, mother returned to check on Gary and found him unresponsive. Mother picked the baby up and ran to the home of Gary's grandmother, who is a nurse, for help and called 911. Gary was later pronounced dead at the scene. The next day, DSS filed the petition seeking to have Glenda declared a neglected juvenile.

In addition to the above findings of fact, the trial court found that the parents "have been instructed about proper sleeping arrangements for children"; that upon arriving at the scene, EMS saw Gary foaming from the nose and mouth, which is indicative of asphyxiation; that the Fayetteville Police Department incident report from that day indicated there were several blankets and bottles in the Pack n Play; and that the medical examiner's autopsy report noted that a child under one year of age sleeping with blankets is at risk for "an accidental asphyxial event." Based on the trial court's findings regarding Gary's death and mother's prior DSS involvement with her older children, the trial court determined that Glenda was a neglected juvenile pursuant to N.C.G.S. § 7B-101(15) because she lived in an environment injurious to her welfare and did not receive proper care, supervision, or discipline from her parent, guardian, or custodian. Following this adjudication, Glenda was ordered to stay in DSS custody.

Under our law, "[a] 'neglected juvenile' is defined in part as one 'who does not receive proper care, supervision, or discipline from the juvenile's parent . . . or who lives in an environment injurious to the juvenile's welfare.' " *In re Stumbo*, 357 N.C. 279, 283 (2003) (quoting N.C.G.S. § 7B-101(15) (2001)). In order to adjudicate a child neglected, "our courts have additionally required that there be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision, or discipline. " *Id.* (cleaned up). Here the trial court did not make such a finding. Accordingly, under North Carolina law, Glenda cannot be adjudicated neglected. Thus, the Court of Appeals correctly concluded that the trial court did not make the necessary findings to support Glenda's adjudication as neglected. *In re G.C.*, 284 N.C. App. 313, 319 (2022).

The appellants in this case, petitioner DSS and the guardian ad litem, make two principal arguments. First, DSS argues that N.C.G.S. § 7B-101(15) does not require a showing of "substantial risk" to adjudicate a child neglected. Petitioner states this omission is in contrast to N.C.G.S. § 7B-101(1)(b) which does require "substantial risk" to adjudicate a child abused. While the majority agrees with this argument, this distinction ignores our precedent on this point, *In re Stumbo*, 357 N.C. 279, and the overarching principles the United States Supreme Court holds as central to a parent's fundamental right to custody, care, and control of their child. *See Troxel*, 530 U.S. at 68-69; *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Quilloin v. Walcott*,

434 U.S. 246, 255 (1978); *J.R.*, 442 U.S. at 602; *Santosky v. Kramer*, 455 U.S. 745, 753 (1982).

A parent's right to "establish a home and bring up children" was acknowledged by the United States Supreme Court as early as 1923. *Meyer v. Nebraska,* 262 U.S. 390, 399 (1923). Since then, the United States Supreme Court has affirmed that there is a "constitutional dimension to the right of parents to direct the upbringing of their children," *Troxel*, 530 U.S. at 65, and that parents have a "fundamental right to make decisions concerning the care, custody, and control of [their children.]," *id. at* 72; *accord Stanley*, 405 U.S. at 651; *Quilloin*, 434 U.S. at 255 (1978); *J.R.* 442 U.S. at 602; *Santosky*, 455 U.S. at 753.

Under this framework, "so long as a parent adequately cares for his or her children (*i.e.*, is [a] fit [parent]), there will normally be no reason for the State to inject itself into the private realm of the family." *Troxel*, 530 U.S. at 68. Thus, it follows that, when a parent's right to custody, control, and care of their children is at issue, the reviewing court must determine whether the parent has the best interests of the child in mind. *Id.* at 69. In doing so, the court must apply the traditional presumption that a fit parent will act in the best interest of his or her child. *Id.*

This Court's requirement that the State make the showing reflected in N.C.G.S. § 7B-101(15), and that there "be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision, or discipline," *In re Stumbo*, 357

N.C. at 283 (2003) (cleaned up), contemplates the framework above and ensures that only children who are neglected are adjudicated as such, *see id.* Perhaps most importantly, in *In re Stumbo*, this Court cautioned that "not every act of negligence . . . constitutes 'neglect' under the law and results in a 'neglected juvenile.' " *Id.* For "[s]uch a holding would subject every misstep by a care giver to . . . the potential for petitions for removal of the child." *Id.* Rather than heed this advice, the majority's holding brushes it aside by effectively abolishing this Court's "impairment" or "substantial risk of impairment" requirement. *See id.*

While the majority acknowledges *In re Stumbo* and its teachings, and admits that decision "remains the law," the majority's analysis reduces *In re Stumbo's* holding to "useful" but "no[t] required" to show neglect under N.C.G.S. § 7B-101(15). Specifically, the majority states that "there is no requirement of a specific written finding of substantial risk of impairment." This holding contravenes North Carolina law as stated in *In re Stumbo* and United States Supreme Court precedent requiring that a reviewing court be certain a parent is unfit before terminating parental rights, *see Troxel*, 530 U.S. at 68–69; *see also In re Safriet*, 112 N.C. App. 747, 752–53 (1993) (stating that a mandatory finding of impairment or substantial risk of impairment properly limits the authority of the State to regulate the parent's constitutional right to rear their children only to when "it appears that parental decisions will jeopardize the health or safety of the child" (first citing *Meyer v. Nebraska*, 262 U.S. 390 (1923); and then quoting *Wisconsin v. Yoder*, 406 U.S. 205, 233–34 (1972))).

Next, DSS and the guardian ad litem argue that under *In re Safriet*, 112 N.C. App. at 753, if findings of fact, viewed in totality, would support a finding of impairment or substantial risk of impairment, then remanding a case to the trial court to make those findings of fact is not necessary. They argue that substantial risk of impairment is supported here by the adjudication of mother's older children as abused and neglected, and by the prior training and instruction the parents received on proper sleeping arrangements and caring for children; however, not only is *In re Safriet* not binding on this Court, but it is also not applicable because the record in this case does not support a finding of impairment or substantial risk of impairment.

*In re Safriet* does not stand for the proposition that a petitioner need not demonstrate impairment or substantial risk of impairment. Instead, while the Court of Appeals in that case acknowledged that the statute is silent as to whether this factor is required, that court also stated that the requirement "is consistent with the authority of the State to regulate the parent[s'] constitutional right to rear their children only when "it appears that parental decisions will jeopardize the health or safety of the child," *In re Safriet*, 112 N.C. App. at 752–53 (1993) (first citing *Meyer*, 262 U.S. at 390; and then quoting *Yoder*, 406 U.S. at 233–34 (1972)). Importantly, in reaching its conclusion that evidence in Ms. Safriet's case supported a finding of physical, mental, or emotional impairment of the child, the Court of Appeals reviewed evidence that is not present in this case. There Ms. Safriet's child was reported to have noticeably poor hygiene, such that "other children made fun of him." *Id.* at 753.

Ms. Safriet also lacked a permanent residence, and the child's school and grandparents did not know how to contact her in case of an emergency. *Id*. In contrast, it is clear in this case that during the nine months DSS was involved in Glenda's life, the parents properly cared for Glenda and abided by all safety plans.

This Court has also previously found that a child cannot be adjudicated neglected based solely on previous DSS involvement with other children. *In re J.A.M.*, 372 N.C. 1, 9 (2019) (quoting *In re A.K.*, 360 N.C. 449, 456 (2006)). "Rather, in concluding that a juvenile 'lives in an environment injurious to the juvenile's welfare,' N.C.G.S. § 7B-101(15), the clear and convincing evidence in the record must show current circumstances that present a risk to the juvenile." *In re J.A.M.*, 372 N.C. at 9. *In re J.A.M.* also reiterates that to adjudicate a child neglected "our courts have additionally required that there be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision or discipline." *Id*. (cleaned up). Thus, while the circumstances surrounding mother's older children may be relevant these circumstances cannot on their own, without a showing of impairment or substantial risk of impairment to Glenda, support Glenda's removal from her parents' care and adjudication of neglect. *See id.* It is also important to note that this case is based on respondent father's appeal and not mother's. Thus, what is at stake are his parental rights.

The majority relies on *In re J.A.M.* to conclude that the facts in Glenda's case reflect "current circumstances that present a risk," and that thus she can be adjudicated neglected. Nonetheless, in reaching its conclusion that evidence in J.A.M.'s case supported that J.A.M. "presently faced substantial risk in her living environment," *id*. at 10, this Court reviewed evidence there that is not present in this case. In *In re J.A.M,* the trial court found that respondent-mother

> (1) continued to fail to acknowledge her role in her rights being terminated to her six other children, (2) denied the need for any services for J.A.M.'s case, and (3) became involved with the father, who [had] engaged in domestic violence . . . even though domestic violence was one of the reasons her children were removed from her home . . .

*Id*. But these facts are not present in Glenda's case. Instead, here the trial court found that Glenda's mother had completed services ordered by the court in her older children's cases, and there is no evidence of domestic violence in her relationship with Glenda's father. Thus, the evidence in this case does not support Glenda's adjudication as a neglected juvenile.

Petitioner DSS and the guardian ad litem argue that Gary's death and the parents' prior knowledge about proper sleeping arrangements for an infant are sufficient to show impairment or substantial risk of impairment for Glenda. Similarly, the majority contends these facts are sufficient to show "current circumstances that present a risk." Yet neither assertion can be true given the undetermined nature of Gary's death.

Sudden Infant Death Syndrome "is the most common cause of death for children between 1 and 6 months of age." *Distinguishing SIDS from Child Abuse*, 421. This condition is defined as the "sudden death of an infant younger than 1 year that remains unexplained after thorough case investigation, including performance of a complete autopsy, examination of the death scene, and review of the clinical history." *Id*. Sudden Infant Death Syndrome is suspected in cases, such as Gary's, in which a healthy child under six months of age "apparently dies during sleep ." *Id*. at 422. When a child is diagnosed with SIDS, this finding "reflects the clear admission by medical professionals that an infant's death remains unexplained." *Id*.

In many cases a parent is blamed for a SIDS death.[3] And while it is true that many SIDS risk factors are preventable,[4] research also suggests some causes of SIDS are outside the parent's control. For example, brain stem abnormalities involving the "delayed development of arousal, cardiorespiratory control, or cardiovascular control" may contribute to SIDS. *Id.* In this case Gary was born on 16 December 2019 and died on 12 March 2020, at just under three months old. The police officer who arrived on the scene made observations indicating that Gary was not malnourished, and had

---

[3] *See Distinguishing SIDS from Child Abuse*, p. 423 (explaining that "the appropriate medical response to every [SIDS] death must be compassionate, empathic, supportive and nonaccusatory", and that "[i]t is important for those in contact with parents during this time to remain nonaccusatory even while conducting a thorough death and/or incident-scene investigation").

[4] For example, "SIDS has been linked epidemiologically in research studies to prone sleep position, sleeping on a soft surface, bed sharing, maternal smoking during or after pregnancy, overheating, [and] late or no prenatal care. " *Id.* at 422.

no signs of physical abuse, such as bruising or burn marks on his body.' Gary's home was also reported to be "in order" and there were no signs of alcohol or drug abuse by the parents. An autopsy was performed on Gary's body, and no internal or external injuries were found. There was also no evidence of injury to Gary's scalp, including no sign of skull fractures. Radiography of Gary's body indicated no acute or chronic fractures.

According to the Medical Examiner who conducted Gary's autopsy, "[t]he lack of significant traumatic injuries, toxicologic findings, congenital abnormalities, infectious disease processes or other natural disease that would account for death" meant that Gary's death "could be consistent with a diagnosis of sudden infant death syndrome." While it is true the Medical Examiner could not rule out "an accidental asphyxial event," there is no evidence in the report to indicate Gary's death was intentional in nature. Ultimately, Gary's cause of death was classified as "undetermined."

Our precedent in *In re Stumbo*, teaches that "not every act of negligence . . . constitutes 'neglect' under the law and results in a 'neglected juvenile.' " 357 N.C. at 283. This is one such case. Losing a child to an unexplained or accidental death would be a painful experience for any parent. To have another child removed from the home on top of that would be devastating. Because the record does not show, and the trial court did not find that Glenda suffered impairment, or that she was at a substantial

risk for such impairment, the Court of Appeals was correct to vacate Glenda's neglect adjudication. In my view, this Court should do the same. Thus, I dissent.

Justice MORGAN joins in this dissenting opinion.